# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANGEL ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-02224-TWP-TAB |
| | ) | |
| THE LILLY EXTENDED DISABILITY PLAN, | ) | |
| ELI LILLY AND COMPANY LIFE | ) | |
| INSURANCE AND DEATH BENEFIT PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff Angel Allen's ("Allen") Motion for Summary Judgment (Filing No. 54) and Defendants the Lilly Extended Disability Plan's and the Eli Lilly and Company Life Insurance and Death Benefit Plan's (together, "Defendants") Cross-Motion for Summary Judgment (Filing No. 57). After Eli Lilly and Company ("Lilly") and its agents terminated her disability benefits, Allen, a former Lilly employee, filed this suit alleging breach of contract. (Filing No. 15.) For the following reasons, the Court **denies** Allen's Motion for Summary Judgment and **grants** Defendants' Cross-Motion for Summary Judgment.

## I.  BACKGROUND

Allen began working at Lilly on January 8, 2001 as a sales representative and marketing associate. (Filing No. 29-7 at 12, 34.) Her employment with Lilly made her eligible for the Lilly Welfare Plan ("Welfare Plan"), an ERISA-governed benefit plan that provides medical, disability, and other benefits to Lilly employees.[1] (Filing No. 29-1 at 35.) The Welfare Plan has several component plans, one of which is the Lilly Extended Disability Plan (the "Plan"). (Filing No. 50-

---

[1] ERISA is the Employee Retirement Income Security Act of 1974, 29 U.S.C. 18 § 1001 *et seq.*

2.) The Plan is administered by the Employee Benefits Committee (the "Benefits Committee"), which is comprised of members appointed by the Board of Directors of Eli Lilly and Company, the Plan's sponsor. (Filing No. 50-2 at 10.) It provides for three disability benefits: (1) a company-provided disability benefit (the "EDL"), (2) an employee paid contributory EDL Plus disability benefit (the "EDL Plus"), and (3) a life insurance benefit (the "Life WP"). (Filing No. 55-1 at 19, 135.)

A.     **Initial Approval for EDL, EDL Plus, and Life WP**

Beginning in June 2006, based on her medical condition and resulting limitations and restrictions, Allen was forced to stop working at Lilly. (Filing No. 15 at 2.) She began receiving short-term disability leave due to her paranoid delusional disorder and attention deficit hyperactivity disorder; however, in early 2008, she began an extended disability leave under the terms of the Plan. (Filing No. 58 at 5; Filing No. 55-1 at 77.) For the first 24 months after a claimant's "Disability Date," the Plan provides benefits to a claimant who is unable "to engage, for remuneration or profit, in the Employee's own occupation provided that the inability results from the Employee's illness or accidental bodily injury and such illness or injury requires the Employee to be under the regular care of a Licensed Physician." *Id.* at 16. After the initial 24-month period, the Plan only provides benefits to those claimants who are unable "to engage…in any occupation consistent with the Employee's education, training, and experience". *Id.* The Plan also requires a claimant to apply for Social Security Disability Benefits ("SSDI") within six months of her "Disability Date." (Filing No. 55-1 at 7.) Allen applied, was approved, and began receiving SSDI in February 2007. *Id.* at 96. In February 2009, the Benefits Committee requested a medical evaluation of Allen to determine whether she met the stricter definition of disability that

would become effective after 24 months. (Filing No. 29-8 at 3-5.) On August 20, 2009, the Plan confirmed that Allen was eligible for continued benefits. (Filing No. 29-7 at 23.)

At some point after that date but before 2014, Lilly engaged an entity called Lilly Leave and Disability Center, which was administered by an entity called Sedgwick Claims Management Services, Inc. ("Sedgwick"). *See* Filing No. 29-7 at 13.[2] On January 9, 2014, Sedgwick wrote to Allen asking her to fill out a "Disability Progress Report," a document in which she was to disclose not only recent medical activity but also personal information like "Interests, Hobbies and Social Activities," "Household Care," and "Education/Experience." *Id.* at 13-18. Allen filled out the form and mailed it to Sedgwick. *Id.* at 8-12. Then, on April 12, 2014, a Sedgwick representative wrote to Allen requesting two more documents: a completed "Authorization for Release and Use of Medical Information," and an "Attending Physician Statement" to be completed by her primary care physician. (Filing No. 29-6 at 55.) Allen successfully submitted these forms, and on June 4, 2014, Sedgwick wrote to inform her that her "request for benefits has been extended beginning 6/11/2014." (*Id.* at 42-43) (A completed copy of the Attending Physician Statement is in the administrative record at Filing No. 29-6 at 44-48. It was faxed on May 28, 2014.)

---

[2] The return address on a letter to Allen dated January 9, 2014 is:

> Lilly Leave and Disability Center
> P.O. Box 14031
> Lexington, KY 40512-4031

But the letter also bears a "sedgwick" logo with "Phone" and "Fax" numbers below it, and the letter's author identifies himself as an extended disability case manager at Sedgwick Claims Management Services, Inc. The e-mail address listed is "Lilly@sedgwickcms.com." And the letter begins, "As you are aware, Eli Lilly and Company has engaged the Lilly Leave and Disability Center (LLDC), administered by Sedgwick, to administer the Extended Disability Leave (EDL) Plan." Because the distinction between the Lilly Leave and Disability Center and Sedgwick is murky, for the sake of clarity, the Court will refer to the administrator of the Plan starting in 2014 as "Sedgwick."

**B.**     **First Termination and Appeal (February 2014 – September 2015)**

Between June 4, 2014 and February 13, 2015, Sedgwick sent Allen a number of requests

for information, including on October 16, 2014, a request for an "Authorization for Release and

Use of Medical Information" form and an "Attending Physician Statement." (Filing No. 29-6 at

36-37.)  The October 16, 2014 letter requested that the Attending Physician Statement be sent by

December 3, 2014.  *Id.*  Receiving no response, Sedgwick reiterated its request on November 6,

2014. *Id.* at 29-30.

On December 11, 2014, Allen's physician, Charles Bensenhaver, III., M.D. (Psychiatry)

("Dr. Bensenhaver") faxed to Sedgwick medical records to document each visit he had with Allen

in 2014. *Id.* at 12-19. Unsatisfied with these records, on January 14, 2015, Sedgwick requested

additional information directly from Dr. Bensenhaver and Ken Edwards, LCSW (Psychology)

("Edwards"), Allen's treating clinical social worker. *Id.* at 10. The request asks for "the attached

form, completed," "Office Treatment Notes dated 2 most recent from Ken Edwards," and "Please

provide next office visit date." *Id.*[3] The health care providers gave the dates they expected to see

Allen for her next appointment and attached notes from her two most recent consultations with

Edwards. *Id.*

In a letter dated February 13, 2015, Sedgwick notified Allen of a decision to terminate her

benefits, effective March 1, 2015. (Filing No. 29-5 at 47-48.) The letter informing Allen of the

termination stated:

> To review whether you remain eligible for continued benefits under the Plan, we
> requested an Attending Physician's Statement and Office Notes from Dr.
> Bensenhaver and Ken Edwards. Office notes were received on 12/11/2014,
> 01/20/2015, and 02/11/2015; however, we did not receive a completed Attending
> Physician's Statement. The office notes received state your mood is stable and
> provide no objective findings to indicate you continue to meet the definition of

---

[3] It is unknown what form, if any, was attached, because the only copy of this request in the administrative record is
the one Allen's health care providers faxed back to Sedgwick. (Filing No. 29-6 at 7-11.)

disability. We have not received additional medical documentation to establish that your condition continues to meet the definition of disability, as required by the Plan outlined above. As a result, your request for continued disability benefits under the Plan has been denied.

*Id.*

On March 3, 2015, Dr. Bensenhaver and Edwards sent a letter to Allen's case manager at Sedgwick indicating their alarm at its decision to terminate Allen's benefits because "[a]s recently as January 6, 2015, Ms. Allen was reporting symptoms of 'paranoid thinking (delusions probably fixed).'" *Id.* at 44. On March 13, 2015, Allen appealed Sedgwick's denial of her claim. *Id.* at 42. On March 20, 2015, Sedgwick acknowledged her appeal and pledged to provide a written response by May 2, 2015. *Id.* at 34. But on April 14, 2015, Sedgwick notified Allen by letter that it was moving her "determination date" to May 25, 2015 because she had not yet "attended the independent medical examination." *Id.* at 32. Nothing in the administrative record indicates that Sedgwick had asked Allen to undergo an independent medical evaluation prior to sending this letter.

On April 22, 2015, Allen received a letter from Lukki Giardono at "Network Medical Review Co. Ltd." saying "Sedgwick CMS has requested that we schedule an Independent Medical Examination with a qualified examiner" and providing the details of an appointment he had scheduled. *Id.* at 31. Licensed psychologist Daniel Garst examined Allen on April 27, 2015 and reviewed some but not all of her medical history (some of her medical history was unavailable to him). ([Filing No. 54-1 at 95-104](#).) Dr. Garst diagnosed Allen with "schizophrenia spectrum disorder and other psychotic disorder." *Id.* at 100. He concurred with Dr. Bensenhaver that the "patient is unable to perform the duties of her own occupation at this time and is a poor candidate for interactions with other employees in a work setting." *Id.* at 101. However, Dr. Garst thought there was some employment that Allen could potentially do:

> [S]he could probably be trained for some type of employment which uses the computer but requires limited face-to-face interaction with other people. Also, the patient was able to complete a program in massage therapeutics. This suggests she would be suitable as a massage therapist if she would certify and keep up with her continuing education.

*Id.* at 102.  He described her incapacity as "temporary." *Id.*

On May 22, 2015, under Sedgwick's letterhead, the Benefits Committee resolved Allen's appeal. ([Filing No. 29-5 at 14](#).)  The Benefits Committee approved Allen to receive disability benefits from March 1, 2015 through November 14, 2015.  The letter cautioned Allen that if she sought disability benefits beyond November 14, 2015

> [T]he Committee will require additional information from you relating to your (i) ability to perform other occupations consistent with your education, training and experience as assessed by vocational and medical experts; (ii) treatment plan to verify that it has been optimized for best medical results consistent with your symptomology and claimed disability; (iii) updated medical records to clarify any claimed disability, your opportunity to return to employment and any potential restrictions.

*Id.* at 15.

On August 12, 2015, Sedgwick asked Allen to participate in vocational rehabilitation training and referred her to a vocational expert in Lexington, Kentucky. ([Filing No. 29-4 at 47](#); [Filing No. 29-5 at 12](#).) Allen participated in the training between August 2015 and December 2015 ([Filing No. 54-1 at 109-128](#).)  She felt the rehabilitation was unsuccessful because she was limited by her work experience and her mental illness. The vocational expert she worked with noted that Allen's mental illness limited her abilities and frustrated her (*id.* at 124-25), but also identified several careers she thought were suitable for Allen, including "graphic design, interior design, interpreter, childcare worker, floral design, and art teacher." ([Filing No. 29-4 at 26-27](#), 29.)

**C.**    **Second Termination and Appeal (October 2015 – March 2016)**

In October 2015, Sedgwick began reviewing Allen's progress to determine whether to extend her benefits. (*Id.* at 16-17.) In an October 14, 2015 letter, Sedgwick requested that Allen provide an "Authorization for Release and Use of Medical Information" form, an "Attending Physician Statement" from her health care provider, and a completed "Disability Progress Report & Employment and Earnings Certification." *Id.* Edwards' treatment records from August, September, and October 2015 indicated Allen's mood was "good" and that she was "motivated." *Id.* at 7-8. Dr. Bensenhaver's records from September and December 2015 indicated that Allen's condition was "about the same." (Filing No. 29-3 at 52.)

On December 17, 2015, Sedgwick informed Allen that her benefits were terminated. *Id.* at 42-43. The letter again noted that Sedgwick had not received the Attending Physician Statement it requested, although it specifically referenced the records it did receive from Edwards and Dr. Bensenhaver. *Id.* It explained that these medical records "did not give any objective information regarding your inability to perform job duties or daily tasks." *Id.* The letter also relied on Dr. Garst's conclusion in the Independent Medical Examination that Allen was able to perform other occupations. *Id.*

Allen appealed Sedgwick's decision to discontinue her benefits on February 10, 2016. *Id.* at 31. The second appeal process was similar to the first. Dr. Bensenhaver and Edwards sent a letter to Sedgwick indicating their disagreement with its decision. *Id.* at 29. And Sedgwick acknowledged the appeal, pledging to resolve it in a written response by April 30, 2016. *Id.* at 30. This time, however, instead of asking Allen to be examined by an independent physician, Sedgwick merely had an independent doctor examine her medical records and offer an opinion. *Id.* at 18-25.

Based mostly on that independent doctor's assessment, the Benefits Committee (on Sedgwick letterhead) denied Allen's appeal. *Id.* at 15-16. The letter noted that the independent physician, Dr. Antoinette Acenas ("Dr. Acenas"), attempted to get in contact with both Edwards and Dr. Bensenhaver but was unable to reach them. *Id.* According to the letter denying Allen's appeal, Dr. Acenas "found that you have not received a full mental status examination or psychological test results to confirm your diagnoses or self-reported symptoms." *Id.* at 16. The decision was also based on recent medical documentation from Dr. Bensenhaver and Edwards, which the Benefits Committee found "fails to document abnormal findings on examination or demonstrate correlation of clinical findings with your self-reported symptoms." *Id.*

On August 19, 2016, Allen filed this lawsuit seeking an order reversing the denial of her EDL benefits plus interest, attorneys' fees, and costs. (Filing No. 1.) She amended her complaint on January 4, 2017, alleging breach of contract for denial of disability benefits and underpayment of disability of benefits. (Filing No. 15.) Allen moved for summary judgment on April 25, 2018 (Filing No. 54), and Defendants responded and cross-moved for summary judgment on May 25, 2018 (Filing No. 57).

## II.     LEGAL STANDARD

### A.     Summary Judgment Standard

Summary judgment is only appropriate by the terms of Rule Procedure 56 where there exists "no genuine issue as to any material facts and … the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56.  This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56.  *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact.

*R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

A court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Likewise, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

## B.    <u>Standard of Review</u>

The parties dispute the standard of review the Court should apply to the Benefits Committee's final decision to deny Allen's benefits. In ERISA cases, the standard of review is either *de novo* or arbitrary and capricious. *See Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). To determine the standard of review the Court looks to the Plan's language. *Id.* The default standard of review of the administrator's determination is *de novo*. *Id.* However, when "the [p]lan documents unambiguously vest the [p]lan with decision[-]making discretion, we

review the denial of benefits under the arbitrary-and-capricious standard." *Burns v. Orthotek, Inc. Employees' Pension Plan & Trust*, 657 F.3d 571, 574 (7th Cit. 2011).  Defendants have the burden to show that the Plan grants the Benefits Committee discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870 (7th Cir. 2006) (quoting *Firestone Tire & Rubber Co.*, v. Bruch, 489 U.S. 101, 105 (1989)).

In an attempt to satisfy that burden, Defendants direct the Court to language in the Plan granting wide discretion to the Benefits Committee to construe the terms of the Plan and to determine benefits.  Section 4.03 of the Welfare Plan allows the Benefits Committee to make and enforce rules regarding administration of the Plan, interpret the instrument (including remedying ambiguities, inconsistences or omissions), and authorize payments. ([Filing No. 29-1 at 40-41](#).) Section 6.03(a) of the Plan says that the Benefits Committee "shall have the discretion to construe the terms of the Plan and to determine whether an [e]mployee has incurred a [d]isability." ([Filing No. 50-2 at 28](#).)  The Plan continues in § 6.03(b):

> The Employee Benefits Committee shall have the discretion to make any finding of fact necessary for the determination of any benefit payable under the Plan. The Employee Benefits Committee may review its prior determination from time to time to ascertain whether there has been any change in the facts or conditions on which the determination was based.

*Id.* at 28-29.  The Plan's language provides wide discretion to the Benefits Committee.  Defendants contend this language indicates an arbitrary and capricious standard of review is appropriate.

In contrast, Allen argues that by "placing a third-party administrator—Sedgwick—in charge of administering [d]isability claims" the Benefits Committee brought itself back into the ambit of *de novo* review. ([Filing No. 54 at 24](#).)  They rationalize that the Plan does not designate any authority or discretion to Sedgwick and it was Sedgwick that made the decision to terminate

Allen's benefits, so that decision should not factor into the Court's review. Allen argues that the language cited below from the Welfare Plan, shows that the Benefits Committee may only delegate administrative or incidental tasks to persons outside the Benefits Committee, and must retain the decision-making function for itself:

> The Employee Benefits Committee may, in its discretion, delegate to any other person or persons authority to act on behalf of the Employee Benefits Committee, including but not limited to the authority to make any determination or to sign any checks, warrants, or other instruments incidental to the operation of the Welfare Plan or any Component plan.

(Filing No. 60 at 25 citing Filing No. 29-1 at 41) (emphasis deleted).)

Allen's argument fails for two reasons. First, she overlooks a crucial portion of the quote above. While the quote focuses on administrative tasks incidental to the essential function of the Benefits Committee, it specifically says the Benefits Committee's authority to delegate includes but is "not limited" to those types of duties. (Filing No. 29-1 at 41.) The Benefits Committee's authority to delegate is as broad as its authority to construe the Plan and determine which employees suffer from a disability.

Second, *Gavin v. Life Ins. Co.*, 2013 WL 677886 (N.D. Ill. Feb. 25, 2013), the case Allen relies on for this argument, is distinguishable from the facts of this case. In *Gavin*, the plan authorized a committee to delegate discretionary authority to the administrator by executing an agreement with the administrator. *Id.* at *4. However, the defendant did not show that it ever entered into an agreement to actually delegate discretionary authority. *Id.* Thus, the defendant merely *could* have delegated, but the defendant did not show that it *did* delegate its authority. *Id.* Language from the Plan or the Welfare Plan that required the Benefits Committee to take the additional step of entering into an agreement with Sedgwick would put this case on all fours with *Gavin*, but Allen fails to identify any such language. In fact, the language Allen did bring to the

Court's attention indicates the Benefits Committee was free to delegate at its whim without limitation. (Filing No. 29-1 at 41.) Therefore, *Gavin* does not apply here.

Because the Plan gives the Benefits Committee broad latitude to enforce and interpret it, and to delegate to other entities, the Court reviews the administrative decision under an arbitrary and capricious standard of review. Courts uphold an administrator's decision under the arbitrary and capricious standard of review unless that decision is "downright unreasonable." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)). Because "[t]he arbitrary and capricious standard is the least demanding form" of review, "any questions of judgment are left to the [plan] administrator" and the Court will uphold the decision if there is "rational support in the record." *Id.*; *Trombetta v. Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan*, 102 F.3d 1435, 1437 (7th Cir. 1996).

## III. DISCUSSION

The material facts in this case are undisputed. The parties' only dispute is a legal issue—whether the Benefits Committee's decision to terminate Allen's benefits violated the terms of the Plan. Allen identifies four specific ways she believes the Benefits Committee violated the terms of the Plan: (1) during her second appeal, the Benefits Committee chose to forego a physical examination of her and instead opted for an independent review of her medical records, (2) Defendants have not demonstrated with medical evidence that her debilitating condition has improved, a requirement for termination under the Plan, (3) Defendants improperly ignored Allen's SSDI benefits, and (4) the Benefits Committee improperly relied on a *post hoc* rationale for denying Allen's appeal. Both parties argue the medical evidence in the record supports their position. The Court will first address the medical evidence, then delve into Allen's specific

allegations of acts by the Benefits Committee and Defendants that she feels violate the terms of the Plan.

A.      **Evidence Supports the Benefits Committee's Termination of Benefits**

Because the material facts are undisputed, the Defendants are entitled to summary judgment if they can show that the Benefits Committee's decision to terminate Allen's disability benefits was not arbitrary and capricious as a matter of law. Conversely, Allen must show that the Benefits Committee's decision was arbitrary and capricious as a matter of law to prevail on her motion.

Under the Plan, Allen suffered from a disability if she was unable "to engage, for remuneration or profit, in any occupation consistent with [her] education, training, and experience." (Filing No. 55-1 at 16.) Allen argues the most recent medical evidence from her health care providers, Dr. Bensenhaver and Edwards, support her disability. Specifically, she focuses on medical reports from her treating physician and social worker which document delusional behavior that she exhibits such as "weird things happening in the condo, pictures falling off the walls," and "strange odors at home, unable to locate source." (Filing No. 55 at 35.) Dr. Bensenhaver and Edwards also relayed Allen's belief that "she has decreased organizational skills, decreased mental and physical skills, decreased memory, and that she is having problems taking care of her activities of daily living." (Filing No. 55-1 at 94.) The two opined that Allen remains disabled and unable to work. *Id.*

The Defendants focus on other evidence in the record—evidence that shows Allen would be able to engage in an occupation. Allen's Disability Progress Report, for example, indicates that she enjoys going to the movies and performing computer activities, cooking a couple days per week, attending church a few times per month, managing her household's finances, and doing

chores like laundry, vacuuming, dishes, and taking out the trash. ([Filing No. 29-7 at 9-11](#).) It also verifies that she was licensed as a massage therapist in December 2009 but lost her license when she failed to keep up with the continuing education requirements. *Id.* at 11.

The Defendants also focus intently on the records that emanated from Allen's work with a vocational expert. According to those records, Allen identified jobs that interested her: interior design assistant, medical coder, and a sales counselor for a home-building company. ([Filing No. 29-3 at 36-39](#), 55; [Filing No. 29-4 at 2-3](#), 11, 13.) She believed that her computer, data entry, customer service and creativity skills would be beneficial to potential employers. ([Filing No. 29-4 at 28](#).) And she told the vocational expert that she felt her medical treatment was "somewhat effective" and that she did "not think that her physical health prevent[ed] her from working," although she had some reservations about her mental health. *Id.* at 26-27. The vocational expert identified potential careers Allen could undertake, including "graphic design, interior design, interpreter, childcare worker, floral design, and art teacher." *Id.* at 29.

Defendants also rely on Dr. Acenas' conclusions from her independent review of Allen's medical record. Dr. Acenas opined that "the claimant's condition does not require any restrictions or limitations." ([Filing No. 29-3 at 19-20](#).) She found Allen's medical record to be devoid of psychological test results that would substantiate Allen's self-reported symptoms, and that the medical record "do not provide information to understand the claimant's disabling diagnosis, findings, limitations, impairments, and treatment plans." *Id.*

The designated evidence in this case is at odds. The record contains evidence that indicates Allen is disabled because she is incapable of holding a job or occupation. But other evidence in the record shows that Allen possesses many skills which would qualify her for work and that her mental disability would not prevent her from doing that work. Considering this conflicting

evidence, the standard of review works in the Defendants' favor. It is the Defendants who are authorized to "construe terms of the Plan" such as "Disability" and who are empowered to "make any finding of fact necessary for the determination of any benefit." (Filing No. 55-1 at 39.) The evidence Defendants cite, although it is not the only evidence in the record, provides a rational basis for denying Allen's claim for benefits. Thus, the Defendants have met their burden of showing that they are entitled to judgment as a matter of law. Nevertheless, the Court will consider Allen's other arguments, in which she attacks Defendants' actions under specific provisions of the Plan.

**B.** **Relevant Plan Provisions**

Allen invokes § 6.02(b) of the Plan, the "Proof of Claims" provision, which says:

> The Employee Benefits Committee may require an Employee to undergo examination by a Licensed Physician or vocational expert chosen by the Employee Benefits Committee to determine the extent of any illness or injury for which the Employee makes a claim under the Plan. The Employee Benefits Committee may require an Employee to undergo such examinations and provide additional supporting information as may be requested by the Employee Benefits Committee as often as is reasonably necessary to determine whether the Employee remains Disabled.

(Filing No. 55-1 at 39.) Allen alleges that the Benefits Committee violated this provision when it relied on Dr. Acenas' medical records review to deny Allen's second appeal, and that the provision required Defendants to demonstrate her debilitating condition had improved, which they did not do. (Filing No. 55 at 26-31.) She also points out that the Plan required her to apply for SSDI benefits and argues that the Benefits Committee should have considered her eligibility for those benefits when it terminated her benefits under the Plan. *Id.* at 31-33. She contends the Benefits Committee improperly relied on *post hoc* justifications for denying her benefits. *Id.* at 33-35.

1. **Record Review by Dr. Acenas**

The Court first addresses whether the medical records review conducted by Dr. Acenas during Allen's second appeal process was appropriate under the terms of the Plan. Section 6.02(b) states "[t]he Employee Benefits Committee may require an Employee to undergo examination by a Licensed Physician or vocational expert…to determine the extent of any illness or injury for which the Employee makes a claim under the Plan." ([Filing No. 55-1 at 39](.)) Allen draws two conclusions from this language. She argues this provision is limiting on the Benefits Committee— it restricts their options for evaluating a claimant to requiring that claimant to undergo examination by a doctor or vocational expert. In addition, she argues that this provision requires the Benefits Committee, if it orders an examination at all, to "obtain a *physical* examination." ([Filing No. 55 at 27](.)) (emphasis in original). Allen argues that the medical records review Dr. Acenas undertook does not satisfy the Proof of Claims provision because it was not a physical examination and because "there was no evidence in the record that Dr. Acenas was a 'Licensed Physician.'" Dr. Acenas is licensed to practice medicine in California, and Allen alleges she went beyond the scope of her medical license by evaluating the records of a patient treated in Indiana and Kentucky. She asserts that the Benefits Committee improperly considered a record review from an in-house nurse, Jan Shrader, and that review violated the provision for the same reasons. *Id.* at 28.

Defendants respond that the Proof of Claims provision is a permissive grant to the Benefits Committee, allowing it to require a claimant to undergo an examination, but not restricting the other evidence it might consider when deciding on a claim. ([Filing No. 58 at 29-30](.)) The Plan, Defendants point out, authorizes the Benefits Committee to "require [a claimant] to … provide additional supporting information" upon request, to "determine … any other matter concerning" a claimant's eligibility for benefits, and "to make any finding of fact necessary" for a benefit

determination.  ([Filing No. 55-1 at 39-40](#).)  The Defendants also challenge Allen's assertion that Dr. Acenas acted beyond the scope of her medical license, citing a Sixth Circuit case (among others) rejecting an argument that out-of-state nurses who reviewed an application for benefits practiced beyond the scope of their licenses because "they did not make any diagnoses or recommendations regarding necessary medical care." ([Filing No. 58 at 30](#)) (citing *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x. 563, 579 (6th Cir. 2016)).  Last, Defendants argue the Benefits Committee was not out of bounds to consider Jan Shrader's evaluation because the Plan allowed the Benefits Committee to require Allen "to undergo examination by a … vocational expert," and Jan Shrader was the supervisor of Amy Drake, the vocational expert Allen worked with at the Benefits Committee's request.

The Court agrees with the Defendants.  Allen confuses a permissive grant in the Plan's language for a restriction.  The Proof of Claim provision allows the Benefits Committee to order an examination of a claimant but does not inhibit the Benefits Committee from considering other evidence, medical or otherwise.  This much is clear from the first subsection of the Proof of Claims provision, which requires a claimant to submit to the Benefits Committee a variety of medical evidence and "such other information as the Employee Benefits Committee shall reasonably require…." ([Filing No. 55-1 at 39](#).) Moreover, Allen's assertion that the examination must be a physical one, as opposed to a paper review of medical records, is unsupported by the language of the Plan.

As to Allen's assertion that Dr. Acenas' review was improper because she acted outside the scope of her medical license, the Court is not persuaded.  The evidence supports that Dr. Acenas is a licensed physician, Board Certified Psychiatry ([Filing No. 29-3 at 18-21](#)), but she was not practicing medicine at the time when she reviewed Allen's medical records because her review

"made no determinations regarding the medical necessity of any treatment," it simply posited an opinion as to whether Allen was capable of working. *Hackney*, 657 F. App'x. at 579. The Plan gives the Benefits Committee an extremely wide grant to consider any information it thinks is relevant when resolving a claim, including the opinion of an out-of-state doctor or a nurse who supervises the claimant's vocational expert. Consideration of the medical records review was appropriate under the Plan.

### 2. __Improved Condition__

The parties disagree as to whether the Plan requires the Benefits Committee to observe an improvement in the claimant's condition in order to terminate her benefits. Section 6.03 states "[t]he Employee Benefits Committee may review its prior determination from time to time to ascertain whether there has been any change in the facts or conditions on which the determination was based." ([Filing No. 55-1 at 39-40](#).) According to Allen, "[t]his provision is not ambiguous. The Committee may only reverse a prior Disability decision—in particular, one that is eight (8) years old—if 'there has been any change in the facts or conditions.'" ([Filing No. 55 at 30](#).) In support of that interpretation, Allen cites two cases from the U.S. District Court for the Northern District of Illinois, *Juszynski v. Life In. Co. of N. Am.*, 2008 WL 877977 (N.D. Ill. Mar. 28, 2008) and *Nickola v. CAN Grp. Life Assurance, Co.*, 2005 WL 1910905 (N.D. Ill. Aug. 5, 2005). In both cases, the court reinstated a claimant's benefits and cited the fact that the defendant did not find an improvement in the claimant's condition as a factor in its decision. *Juszynski* at *6 ("the fact that LINA had already approved LTD benefits may weigh in favor of Juszynski if LINA has failed to produce evidence that either the claimant's medical condition improved or the information available to the insurer otherwise changed in some significant way"); *Nickola* at *8 ("if an insurer has already admitted that someone is so incapacitated that they are entitled to long-term disability

payments, one can reasonably view the failure to produce evidence of improvement as a suspicious failing if the insurer decides that LTD benefits are no longer warranted").

The Seventh Circuit has rejected the argument that a provider must see an improvement in a claimant in order to properly terminate benefits, and this Court has followed its lead. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 (7th Cir. 2010) ("Holmstrom argues that MetLife could not properly terminate her benefits without proving that her condition had actually improved. We have rejected this argument before…. This circuit and the Eighth Circuit have noted the 'the previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome.'") (quoting *Leger v. Tribute Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009); *see also Aschermann v. Aetna Life Ins. Co.*, 2011 WL 6888840 at *13 (S.D. Ind., Dec. 30, 2011) and *Trice v. Lilly Employee Welfare Plan*, 2013 WL 6804749 at *14 (S.D. Ind., Dec. 19, 2013). The language of this specific Plan does not convince the Court that the parties intended to circumvent the rule in this circuit—that improvement is a factor for the provider of benefits to consider but not a hurdle it must overcome. While the language Allen quotes says the Benefits Committee may review a claim "to ascertain whether there has been any change in the facts or conditions" under which the claim was granted, it does not limit the Benefits Committee to reviewing claims for only that purpose. Accordingly, the Court will factor the Benefits Committee's initial decision to grant benefits and the portion of the evidence that Allen's condition since then has been static into its calculus, but it does not grant Allen's summary judgment motion on that basis.

### 3.    <u>Award of SSDI Benefits</u>

Allen next asserts that the Benefits Committee ignored her receipt of SSDI benefits in the appeal process because it was not mentioned in the denial letter. ([Filing No. 55 at 31-34](#).)

Defendants respond that the Benefits Committee fully accounted for Allen's SSDI benefits. (Filing No. 58 at 31-34.) The Seventh Circuit has stated that "an administrator's failure to consider the [SSDI] determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom*, F.3d at 772-73. Allen contends that ignoring a favorable SSDI decision should lead to reversal of an administrator's decision, relying on *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998). *Ladd*, however, is distinguishable from this case, because in *Ladd* the plaintiff was denied disability benefits after his condition unequivocally deteriorated. Here, as the Court discussed above, there is evidence both that Allen's condition has improved and that it has worsened or remained the same. The Benefits Committee was aware of Allen's SSDI benefits because they were discussed both in Dr. Garst's independent medical examination report and in the vocational expert reports. (Filing No. 55-1 at 96; Filing No. 29-4 at 13.) And in light of the evidence in the record supporting the Benefits Committee's determination, its decision not to mention Allen's SSDI benefits in its final decision on her appeal is "more of a benign omission, not a disingenuous attempt to … ignore them when no longer favorable to the Plan." *Trice* at *14.

Additionally, Allen's argument ignores Seventh Circuit caselaw proclaiming, "an administrator is not forever bound by a Social Security determination of disability." *Holmstrom*, F.3d at 772-73. "The plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind." *Id.* at 767. The Defendants acknowledge that the Social Security Administration's disability determination was rendered nearly ten years before the Benefits Committee denied Allen's appeal. (Filing No. 58 at 32.) In the ten years since that determination, Allen has received medical treatment from Dr. Bensenhaver and participated in vocational rehabilitation. The Plan entitled the Benefits Committee to give more significant weight to more recent evidence and to discount a Social Security Administration determination from

nearly a decade ago. Allen's argument that the Benefits Committee erred or acted in an arbitrary and capricious manner by failing to give significant weight to her status as an SSDI beneficiary does not persuade the Court.

### 4. *Post Hoc* Rationale

Allen asserts that the Benefits Committee relied on *post hoc* rationales to deny her appeal of the termination of her benefits. ([Filing No. 55 at 33-35](#).) Specifically, (1) the Benefits Committee used her voluntary efforts to cooperate in its vocational rehabilitation program as evidence that she was not disabled, (2) it cited her ability to participate in social functions and attend to activities of daily living, but did not identify which functions and activities she was able to complete, and (3) it considered her ability to effectively communicate her request for benefits as a reason to terminate her benefits. Allen cites *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 696 (7th Cir. 1992) for the proposition that "[a] post hoc attempt to furnish a rationale for a denial of … benefits in order to avoid reversal on appeal, and thus meaningful review is not acceptable." (internal quotations omitted).

Defendants explain their rationale on Allen's appeal by citing ERISA's requirements, which force an administrator to disclose "specific reasons" upon its termination or denial of benefits, but not "the reasoning behind the reasons," such as the interpretive process that generated the reason for the denial." ([Filing No. 58 at 32-33](#)) (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1995)). The notice surrounding the initial termination of benefits decision informed Allen that the record showed she was able to perform other reasonable occupations and that she had not presented objective information regarding her inability to perform job duties or tasks. ([Filing No. 29-3 at 42-43](#).) Then, on appeal, the Benefits Committee specified that the records of Allen's vocational rehabilitation program showed that she was "able to participate in regular

vocational rehabilitation and take steps to seek and apply for employment." *Id.* at 16. The rationale offered by the Benefits Committee's denial of Allen's appeal was in line with, though more specific than, the rationale offered by the initial termination of benefits, according to the Defendants.

The Court finds that any *post hoc* rationale offered by the Benefits Committee does not entitle Allen to summary judgment given the evidence in the record supporting termination and the standard of review in this case. There is rational support in the administrative record for terminating Allen's benefits. The Benefits Committee's denial of her appeal cites to that evidence—including the medical documents provided by Dr. Bensenhaver and Edwards and a review of that documentation by an independent doctor that noted a lack of clinical findings to support the diagnosis. The rationale Allen complains of comes at the end of the decision, after the Benefits Committee has cited the evidence that this Court has determined supports termination of Allen's benefits. Under an arbitrary and capricious standard of review, the Court may only overturn the Benefits Committee's decision if it is unreasonable and there is no rational support for it in the record. If the paragraph Allen cites were the only justification the Benefits Committee provided, the Court might determine it had acted in an arbitrary and capricious manner. Because the Benefits Committee relied on evidence in the record that supported its decision, Allen's Motion for Summary Judgment is **denied**.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES** Allen's Motion for Summary Judgment (Filing No. 54) and **GRANTS** Defendants' Cross-Motion for Summary Judgment (Filing No. 57). Allen's claims for breach of contract, as well as her claims for interest and attorneys' fees and costs are **dismissed**. The Court will issue final judgment in a separate order.

**SO ORDERED.**

Date: 3/29/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Andrew M. Grabhorn
GRABHORN LAW OFFICE PLLC
a.grabhorn@grabhornlaw.com

Michael D. Grabhorn
GRABHORN LAW OFFICE, PLLC
m.grabhorn@grabhornlaw.com

Stephanie L. Boxell
FAEGRE BAKER DANIELS LLP (Indianapolis)
stephanie.boxell@faegrebd.com

Philip John Gutwein, II
FAEGRE BAKER DANIELS LLP (Indianapolis)
philip.gutwein@FaegreBD.com